**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

SOUTH CAROLINA REPUBLICAN PARTY,

          *Plaintiff*,

     v.

ROBERT BOLCHOZ, in his official capacity as Chairman of the South Carolina State Election Commission; JOANNE DAY, CLIFFORD J. EDLER, SCOTT MOSELEY, and ANGELA STRINGER, in their official capacities as members of the South Carolina State Election Commission; and CONWAY BELANGIA, in his official capacity as Executive Director of the South Carolina State Election Commission,

          *Defendants,*
   and

VETERANS FOR ALL VOTERS, and THE CHAMBERLAIN NETWORK,

          *Putative Intervenors.*

Case No. 3:26-cv-2699-MGL

**MOTION OF VETERANS FOR ALL VOTERS AND THE CHAMBERLAIN NETWORK
TO INTERVENE AS DEFENDANTS[1]**

---

[1] Undersigned counsel conferred with attorneys for the Plaintiff and Defendants as required under Local Civ. R. 7.02. Plaintiff objects to this Motion. According to counsel for Defendants, they "will review the forthcoming Motion to Intervene and advise the Court of the SEC's position."

There is no accompanying memorandum of law because a full explanation for the Motion is contained herein. *See* Loc. Civ. R. 7.04 & 7.05.

TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND....................................................................................................................2

I. South Carolina's Primary System ................................................................. 2

    A. The State administers semi-open primary elections. ...................................... 2

    B. In South Carolina, primary elections are often the singular election-of-consequence for voters. ........................................................................................... 3

II. The Party's Failed Attempts to Close Primaries ............................................. 4

    A. Failed Litigation.......................................................................................... 4

    B. Failed Legislative Attempts ......................................................................... 5

    C. Amended Party Rules .................................................................................. 6

III. The Putative Intervenors ............................................................................... 6

    A. Veterans for All Voters ............................................................................... 6

    B. The Chamberlain Network........................................................................... 7

ARGUMENT........................................................................................................................8

I. Movants are entitled to intervene as a matter of right. .................................... 8

    A. The Motion to Intervene is timely................................................................ 8

    B. Putative Intervenors and their members have significant and protectable interests in voting in state-run primary elections. ........................................... 9

    C. Disposition of this case may threaten Putative Intervenors' interests........................... 12

    D. Defendants' interests differ from those of the Putative Intervenors. ............................ 13

II. In the alternative, this Court should grant permissive intervention. .............................. 16

CONCLUSION ...................................................................................................................18

Veterans for All Voters (VAV) and The Chamberlain Network (TCN) (collectively, "Putative Intervenors") respectfully move to intervene as defendants pursuant to Rule 24(a) of the Federal Rules of Civil Procedure or, in the alternative, pursuant to Rule 24(b), and set forth the legal argument necessary to support their Motion below. Putative Intervenors append to this Motion a proposed motion to dismiss by way of a response to the Plaintiff's Complaint, while reserving their right to supplement their response to the Complaint within the time allowed for response by Rule 12 after intervention is granted. *See* Fed. R. Civ. P. 24(c).

### INTRODUCTION

Plaintiff the South Carolina Republican Party ("Party") seeks to exclude scores of eligible voters—including numerous members of VAV and TCN—from participating in state-run, primary elections for Congress, State House, State Senate, and other offices. To protect their members' fundamental rights to vote, Putative Intervenors move to intervene as defendants in this action under Rule 24(a) or, alternatively, under Rule 24(b), of the Federal Rules of Civil Procedure.

Putative Intervenors VAV and TCN—membership organizations that advocate for open, fair, and transparent elections and represent veterans who would be excluded from voting in primaries under the relief the Party seeks—easily meet the four-part standard for intervention as of right. Fed. R. Civ. P. 24(a). The Motion is timely because it was filed just over three weeks after the Complaint. The relief the Party seeks—excluding independent voters from state-run primary elections—directly impairs the voting rights of Putative Intervenors and their members. *See United States v. Classic*, 313 U.S. 299 (1941) (recognizing constitutional right to vote in primaries). Finally, the named Defendants do not adequately protect Putative Intervenors' interests. In voting-rights cases, courts routinely recognize that state defendants do not adequately represent the interests of individual voters. *See, e.g.*, *Jud. Watch, Inc. v. Ill. State Bd. of Elections*, No. 24-cv-1867, 2024 WL 3454706, at *4–5 (N.D. Ill. July 18, 2024) (allowing associations representing voters to intervene as defendants in NVRA action to protect their "interest in preserving *their* resources and protecting the voting rights of *their* members").

1

Alternatively, permissive intervention is proper because the Motion is timely, Putative Intervenors' defenses share common questions of law with the Party's claims, and intervention will not unduly delay or prejudice the original parties. *See* Fed. R. Civ. P. 24(b). To resolve the Party's claims, the Court must balance the burdens imposed by semi-open primaries (if any) on the Party's rights against the State's interests in, *inter alia*, "protecting and preserving the integrity of the nominating process, promoting fairness, increasing voter participation, and ensuring administrative efficiency." *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 671 (D.S.C. 2011) ("*SCGOP I*") (denying identical facial challenge to semi-open primaries). Because that analysis necessarily demands consideration of the interests of voters like those represented by Putative Intervenors, permissive intervention is appropriate. *See Thomas v. Andino*, 335 F.R.D. 364, 371 (D.S.C. 2020) (granting permissive intervention to the South Carolina Republican Party where the plaintiffs challenged certain provisions of a voting law as unconstitutional, while the Party sought to uphold its constitutionality).

## BACKGROUND

### I.  South Carolina's Primary System

#### A.  The State administers semi-open primary elections.

South Carolina uses a semi-open primary election system as the general method of nominating party candidates for inclusion in its general election. Under this system, any registered voter may vote in the party primary of their choosing, provided they vote in only one party primary during any single election cycle. S.C. Code Ann. §§ 7-9-20, 7-13-1010. The State does not manage a formalized system of party registration. *See id*. § 7-9-20.

Primaries are state-administered and funded, primarily through the County and State Election Commissions. *Id*. § 7-13-15. If a party does not wish to participate in the state-funded primary process, it is not required to do so. Instead, it may nominate its candidates by convention or by petition. *Id*. § 7-11-10.  To nominate candidates by convention, three-fourths of the party's convention membership must vote to use the convention nomination process. *Id*. § 7-11-30.

2

### B. In South Carolina, primary elections are often the singular election-of-consequence for voters.

Over seventy-five years ago, Judge Waring observed that when one party dominates the political landscape, primary elections offer the one and only opportunity for voters to meaningfully participate in the democratic process. *See Elmore v. Rice*, 72 F. Supp. 516, 521–22 (E.D.S.C. 1947). That is no less true today. The Party has a supermajority in both legislative chambers, controls six of seven U.S. House seats, and controls the offices of the Governor, Lieutenant Governor, Attorney General, Secretary of State, State Treasurer, Comptroller General, and Superintendent of Education. The last time a non-Republican won a statewide office was in 2006, when Democrat Jim Rex was elected as the State Superintendent of Education. *See, e.g.*, *Election Results*, S.C. Election Comm'n, https://scvotes.gov/elections-statistics/election-results/ [https://perma.cc/SE6M-Q47M].

Partisan gerrymandering has further augmented the Party's control over general election outcomes. Because of how electoral districts are drawn, Republican candidates start with *at least* a ten-point electoral advantage in 82 out of 124 House districts, 30 out of 46 Senate districts, and 6 out of 7 Congressional districts. Indeed, of the 177 electoral districts drawn by the General Assembly, only 17—less than 10%—are drawn to produce competitive general elections.[2] In the wake of the Supreme Court's decision in *Louisiana v. Callais*, 146 S. Ct. 1131 (2026), the Party has announced plans to *further* gerrymander the state's electoral districts in favor of Republicans. *See, e.g.*, Josh Dawsey and Ken Thomas, *Trump's Team Expands Redistricting Push After Scoring Wins in Court*, WSJ (May 8, 2026 8:05 PM), https://www.wsj.com/politics/policy/trumps-team-expands-redistricting-push-after-scoring-wins-in-court-0f51156c?reflink=desktopwebshare_permalink (citing Drew McKissick, the Chairman of the Party, as stating that "the party looks forward to the chance to grow its Republican congressional delegation, and will fight to do so").

---

[2] The redistricting platform, Dave's Redistricting, defines a district as "competitive" if its two-party vote share is between 45–55%.

3

As partisan gerrymandering efforts continue, general election results will become increasingly engineered to produce inevitable outcomes. Indeed, Governor McMaster recently proclaimed: "I am confident that one day South Carolina's congressional delegation will be completely Republican." *Statement from Gov. Henry McMaster on Congressional Redistricting*, Governor.sc.gov (May 27, 2026), https://governor.sc.gov/news/2026-05/statement-gov-henry-mcmaster-congressional-redistricting [https://perma.cc/8DNZ-B94H]. By that, he did not mean that Republican candidates to Congress would sway more voters; rather, he meant that districts would be engineered to eliminate *any* electoral opportunity for non-Republican voters. If South Carolina's primaries are closed, independent and unaffiliated voters who cannot vote for the Republican nominee will be stripped of their vote in the decisive election and will become bystanders to the democratic process.

Even setting aside races that are functionally noncompetitive because of natural political geography or deliberate gerrymandering, many races are *literally* noncompetitive. According to data from scvotes.gov, 55 races have contested primaries but no contested general election.[3] They include races for the State House, county council, sheriffs and probate judges. *See id*. For nonpartisan veterans focused on the specific issues that most directly impact their communities, these are often the elections that matter most. If those primaries were closed, independent voters would be completely excluded from the democratic process.

## II. The Party's Failed Attempts to Close Primaries

### A. Failed Litigation

The Party has sought to exclude voters from state-run primary elections for more than a decade. In June 2010, the Party sued the State and the Chairman of the South Carolina State Election Commission in this District, alleging that the semi-open primary system violated the

---

[3] *Compare* 11/3/2026 Statewide General Election, https://vrems.scvotes.sc.gov/Candidate/CandidateSearch?electionId=22596 [https://perma.cc/UNX5-43FY] *with* 6/9/2026 Statewide Primary, https://vrems.scvotes.sc.gov/Candidate/CandidateSearch?electionId=22598 [https://perma.cc/G937-KGC2].

4

Party's rights to freedom of association and equal protection.[4] *See SCGOP I*, 824 F. Supp. 2d at 659–61. Notably, another judge of this District allowed several organizations representing independent voters' interests to intervene in that action after the existing parties had filed cross-motions for summary judgment. *Id*. at 660–61. In ruling on the summary judgment motions, the court reviewed the *same* system and statutes challenged here and found them categorically constitutional on their face.[5] *Id*. at 666–67 (analyzing S.C. Code Ann. §§ 7-9-20, 7-11-20, 7-11-30 and holding that "South Carolina's open primary laws are not facially unconstitutional"). Afterward—presumably seeing the writing on the wall—the Party abandoned the action and, with it, its as-applied constitutional arguments. *See Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 604 Fed. App'x 244, 249–50 (4th Cir. 2015) (*SCGOP II*). Conspicuously, the Party nowhere mentions this failed litigation in its Complaint.

## B. Failed Legislative Attempts

More recently, in the 2025–26 legislative session, several Republican-backed bills were introduced to amend the open primary system. *See* H.B. 4250, S.B. 109, S.B. 113, H.B. 3310, and H.B. 5183, 2025–26 Gen. Assemb., 126th Sess. (S.C. 2025–26). Not only were these bills backed by Republican legislators, but Republican Attorney General Alan Wilson also provided public support. In a January 21, 2026 post on his official X account he wrote:

> Closing primaries protects the integrity of our elections, strengthens accountability, and ensures our party reflects the values of those who actually believe in it.
>
> I'm glad to see the issue finally getting attention in the legislature.

---

[4] The Greenville County Republican Party Executive Committee, Patrick B. Haddon, in his official capacity as the Chairman of the Greenville County Republican Party, and William "Billy" Mitchell joined the Party as additional plaintiffs in the suit. *SCGOP I*, 824 F. Supp. 2d at 659. Pursuant to these other plaintiffs' interests, they challenged certain laws related to the candidate nomination process by municipalities that are not relevant to this litigation. In any event, the Court found them facially constitutional.

Alan Wilson (@AGAlanWilson), X (Jan. 21, 2016, at 2:09pm), https://x.com/AGAlanWilson/status/2013977318125908256 [https://perma.cc/Z5TE-QHZ2]. But despite the Attorney General's endorsement and the Party's supermajority in both legislative chambers, none of the proposed bills became law. *See, e.g.*, Skylard Laird, *SC Republican Party Plans to Sue for Closed Primaries*, S.C. Daily Gazette (May 12, 2026), https://scdailygazette.com/2026/05/12/sc-republican-party-plans-to-sue-for-closed-primaries/.

After the legislature failed to enact a closed-primary bill, the Party held a press conference on May 12, 2026, announcing its intention to challenge the open-primary system in federal court. *See id*. Specifically, Party Chairman Drew McKissick said the goal of the suit would be to "stop voters who aren't Republicans from voting in GOP primaries" and called it "the only alternative that we have left." *Id*. Attorney General Alan Wilson again publicly expressed support for the Party's effort by appearing directly beside the Chairman at the press conference. *See id*.

### C. Amended Party Rules

On June 27, 2026, the Party adopted new rules at its convention requiring anyone participating as a voter in the Republican primaries to register as a Republican and requiring candidates to have been registered as a Party member for at least 90 days and to have voted in at least two of the past three Republican primary elections. New S.C. Republican Party Rules, Dkt. No. 1-1.

## III. The Putative Intervenors

### A. Veterans for All Voters

Veterans for All Voters (VAV) is a nonpartisan 501(c)(3) organization founded in 2021 by two Navy veterans. *See* Ex. A, Decl. of Alberto Ramos (VAV Decl.) ¶ 3. The organization is dedicated to ensuring that veterans have a meaningful voice in the democratic process and that the country's political systems are accountable to all Americans. *Id.* ¶ 4. VAV has members throughout South Carolina, including through an active South Carolina chapter. *Id.* ¶ 5; *see also* Ex. B, Decl. of Christopher Himsl (Himsl Decl.) ¶ 5. South Carolina is home to nearly 400,000

6

military veterans, and a substantial portion of them do not affiliate with either major political party. *See* VAV Decl. ¶ 6; U.S. Dep't of Veterans Affs., *Distribution of Veterans by County (FY2023)*, https://www.data.va.gov/stories/s/NCVAS-State-Summary-South-Carolina-FY2023/xhx8-6a7y/ [https://perma.cc/3VS8-VXE2] (last visited July 30, 2026). Retired Army Colonel Christopher Himsl, for example, is a member of VAV who lives in South Carolina and identifies as "politically independent." Himsl Decl. ¶ 7. According to Retired Colonel Himsl, issues "common to other veterans" like "VA funding, military benefits, Tricare and veterans healthcare, defense budgets, [and] veterans' employment programs … do not always fall along party lines." *Id.*

Nationally, over half of post-9/11 veterans identify as political independents, a rate that has historically exceeded that of the general public. *Id.* ¶ 6. In many communities where a single primary is the decisive electoral event, independent-minded veterans have historically relied on open primaries to meaningfully participate in the democratic process. *See, e.g.*, Himsl Decl. ¶¶ 7, 9. This is the case in South Carolina, and the VAV has a strong interest in protecting its members' right to participate in the primary of their choosing.

### B.  The Chamberlain Network

The Chamberlain Network (TCN) is a similar nonprofit organization with a nonpartisan mission to mobilize and empower veterans to protect democracy through organization, education, and community engagement. Ex. C, Decl. of Peter Lucier (TCN Decl.) ¶¶ 3–4. It is a network of thousands of veterans dedicated to combating polarization in the military. *Id*. ¶¶ 4–5. TCN has approximately 70 members in South Carolina, including many who do not identify with a single political party. *Id*. ¶¶ 8–9. Like the VAV, TCN has a significant interest in defending the semi-open primary system in South Carolina and similar ones nationwide. *Id*. ¶ 7. Retired Colonel Himsl, an independent voter and resident of Columbia, SC, is a member of TCN and would be excluded from participating in decisive primary elections if the Party prevails. Himsl Decl. ¶¶ 6, 8–10.

**ARGUMENT**

**I.     Movants are entitled to intervene as a matter of right.**

Under Federal Rule of Civil Procedure 24(a)(2), the Court must permit anyone to intervene as a matter of right who meets the following requirements:

> (1) the application to intervene must be timely; (2) the applicant must have an interest in the subject matter of the underlying action; (3) the denial of the motion to intervene would impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the existing parties to the litigation.

*Houston Gen. Ins. Co. v. Moore*, 193 F.3d 838, 839 (4th Cir. 1999). In the Fourth Circuit, "liberal intervention is desirable to dispose of as much of a controversy 'involving as many apparently concerned persons as is compatible with efficiency and due process.'" *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (quoting *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)). Putative Intervenors indisputably meet each of the requirements of Rule 24(a)(2). This Court should grant their intervention as a matter of right.

**A.  The Motion to Intervene is timely.**

Putative Intervenors' Motion is timely. In assessing timeliness, a court looks at "three factors: first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, [whether] the movant was tardy in filing its motion." *Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, 539 F. Supp. 3d 543, 561 (D.S.C. 2021) (quoting *Alt v. U.S. E.P.A.*, 758 F.3d 588, 591 (4th Cir. 2014)). While "[m]ere passage of time is but one factor to be considered . . . [t]he most important consideration is whether . . . delay has prejudiced the other parties." *Spring Const. Co. v. Harris*, 614 F.2d 374, 377 (4th Cir. 1980) (citations omitted) (affirming intervention four years after litigation commenced). A motion to intervene is "undoubtedly timely" when filed within a few weeks of the Complaint, before discovery is conducted or dispositive motions are decided. *Equal Emp. Opportunity Comm'n v. 1618 Concepts, Inc.*, 432 F. Supp. 3d 595, 607 (M.D.N.C. 2020) (motion "undoubtedly timely" when filed 38 days after complaint); *see also S.C. Coastal Conservation League v. Pruitt*, No. 18-CV-330, 2018 WL

8

2184395, at *8 (D.S.C. May 11, 2018) ("[The] motions to intervene are timely, as they were filed within twenty-two days of the filing of the initial complaint. No discovery has been conducted or dispositive motions decided.").

Little time has passed in this action, and any minimal delay resulting from this Motion will not prejudice the other parties. The Party filed this lawsuit on July 6, 2026, and, upon receiving notice of the suit, Putative Intervenors promptly prepared and filed this Motion. Since less than a month has passed, the underlying suit has not progressed past its earliest stages. Defendants have not yet filed responsive pleadings, discovery has not commenced, and this Court has not expended any significant resources on the case. Putative Intervenors are also prepared to comply with any scheduling orders entered by this Court. Intervention therefore will not cause any delay that would unduly prejudice the existing parties. *See Defs. of Wildlife*, 539 F. Supp. 3d at 561 (finding that "suit ha[d] not progressed very far" and intervention would cause "only minimal prejudice" when intervenor filed motion six months after litigation commenced and one month after plaintiff moved for preliminary injunction); *Fleming v. Citizens for Albemarle, Inc.*, 577 F.2d 236, 238 (4th Cir. 1978) (appellant had right to intervene even after a final decree had been entered).

**B. Putative Intervenors and their members have significant and protectable interests in voting in state-run primary elections.**

Putative Intervenors have "sufficient"—i.e., "significantly protectable"—interests in this litigation. *Donaldson v. United States*, 400 U.S. 517, 531 (1971). An intervenor has an interest in the subject matter of the action where the intervenor "stand[s] to gain or lose by the direct legal operation of the district court's judgment" in the underlying action. *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991). The interest simply needs to be "of the type that the law deems worthy of protection, even if the intervenor . . . would not have standing to pursue [their] own claim." *Texas v. United States*, 805 F.3d 653, 657–59 (5th Cir. 2015). Putative Intervenors' organizational interests as well as the interests of their individual members support intervention as of right. *1789 Found. Inc. v. Fontes*, No. CV-24-02987, 2025 WL 834919, at *2–3 (D. Ariz. Mar. 17, 2025)

9

(finding two protectable interests under Rule 24(a)(2): "(1) protecting the voting rights of their members and constituents, and (2) preserving their mission-critical organizational resources").

Putative Intervenors' interest in protecting the fundamental voting rights of their members is, alone, enough to justify intervention as of right. *See, e.g.*, *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, No. 5:24-CV-00547, 2024 WL 4349904, at *2–3 (E.D.N.C. Sept. 30, 2024); *1789 Found. Inc.*, 2025 WL 834919, at *2–3; *Jud. Watch*, 2024 WL 3454706, at *3. Voting is "a fundamental political right [that is] preservative of all rights." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (quoting *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)). Indeed, "[t]he right to vote freely" and "to have one's vote counted" is "the essence of a democratic society." *Reynolds*, 377 U.S. at 554–55 (citation modified); *see Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). The right to vote in "free and open" elections is protected by the South Carolina Constitution. S.C. Const. art. I, § 5 (free and open elections); *see also id.*, art. II (rights of suffrage). All these rights "indisputably" extend to primary elections. *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1026 (9th Cir. 2016) ("[P]rimary elections are state action subject to the same constitutional constraints as general elections."); *see, e.g.*, *Smith v. Allwright*, 321 U.S. 649, 661–66 (1944); *Classic*, 313 U.S. at 318–19; *cf. State v. Huntley*, 166 S.E. 637 (S.C. 1932) (prohibiting state-run elections from enforcing party-based voter exclusions).

Putative Intervenors are membership-based networks of thousands of veterans dedicated to protecting their members' rights to participate in free and fair elections. VAV Decl. ¶¶ 5–6; TCN Decl. ¶¶ 4, 7. Both organizations have active South Carolina chapters, where nearly 400,000 veterans reside. *See* U.S. Dep't of Veterans Affs., *Distribution of Veterans by County (FY2023)*, https://www.data.va.gov/stories/s/NCVAS-State-Summary-South-Carolina-FY2023/xhx8-6a7y/ / [https://perma.cc/3VS8-VXE2] (last visited July 30, 2026); VAV Decl. ¶ 5; TCN Decl. ¶¶ 6–7. Half of modern-day veterans do not affiliate with either major political party and the Putative Intervenors speak for the interests of those independent voters, including those in South Carolina. VAV Decl. ¶ 6; TCN Decl. ¶¶ 8–9. Unlike the general voting public, independent voters are uniquely positioned to lose their right to participate in the primary process if the Party is granted

10

the relief that it seeks. TCN Decl. ¶ 10. And when the primary is *the* election of consequence, as is increasingly the case in South Carolina, independent voters such as Putative Intervenors' members will be disenfranchised entirely by a closed primary system.

Additionally, Putative Intervenors' members have an interest beyond that of the general public in remaining party-neutral and voting in the primary that focuses most acutely on key veterans' issues. *See, e.g.*, Himsl Decl.¶¶ 8–9. The policy issues that affect veteran voters often transcend party affiliation. *See, e.g.*, TCN Decl. ¶ 8; Brad Dress, *Officials Say Veterans Issues Must Retain Nonpartisan Focus as Washington Reshapes After Elections*, The Hill, (Nov. 13, 2024) https://thehill.com/policy/defense/4988123-officials-say-veterans-issues-washington-elections/ (ranking member of the Senate Veterans' Affairs Committee noting that for veterans "there are very few issues that really should divide us on partisan lines"). Putative Intervenors' members must rely on the semi-open primary system to have any chance at having their concerns addressed by their elected officials. In the alternative closed primary system, where politicians must only win their party's primary to stay in office, politicians have no incentive to take on the particular interests and positions of independent veterans. *See, e.g.*, Himsl Decl. ¶ 10.

Beyond just their members' interests, Putative Intervenors have significant and protectable interests in this litigation because their core organizational missions will be harmed if the relief sought is granted. VAV Decl. ¶¶ 7–10; TCN Decl. ¶¶ 11–13. Courts routinely find that organizations have a significantly protectable interest to intervene where a lawsuit threatens to impede their primary mission or require them to divert resources because of the outcome. *See, e.g.*, *1789 Found. Inc.*, 2025 WL 834919, at *3 ("Proposed Intervenors here have demonstrated significant protectable organizational and associational interests in protecting their own constituents' voting rights and in preserving their financial resources."); *Planned Parenthood Minn. v. Daugaard*, 836 F. Supp. 2d 933, 940 (D.S.D. 2011) (protectable interest for purposes of Rule 24(b) where lawsuit threatened to impede the organizations' "primary mission of counseling pregnant women").

11

Both organizations work to engage veterans, and in doing so they expend significant resources on voter education and voter engagement. VAV Decl. ¶ 7; TCN Decl. ¶ 13. If the relief sought is granted, Putative Intervenors' mission to promote veteran voting and ensure political accountability to veterans will be frustrated regardless of the time, money, and effort the organizations have and will expend. In addition, one of TCN's organizational priorities is to decrease its members' political polarization. TCN Decl. ¶ 12. A ruling in Plaintiff's favor will exacerbate polarization by making it imperative to identify with a specific group to participate in the primary process. *Id.* TCN will be forced to redirect resources away from its core activities to close this divide and mitigate registered voters' disenfranchisement. *Id.*

Accordingly, Putative Intervenors—both on behalf of their members and organizationally—have significant, tangible interests in the outcome of this litigation that support intervention as of right.

### C. Disposition of this case may threaten Putative Intervenors' interests.

Putative Intervenors satisfy Rule 24(a)(2)'s interest impairment requirement because the litigation may result in an order that directly affects their interests. To satisfy this element, intervenors "do not need to establish that their interests *will* be impaired. Rather, they must demonstrate only that the disposition of the action 'may' impair or impede their ability to protect their interests." *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014). "This burden is minimal." *Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999) (citation modified).

The threat to Putative Intervenors' interests is particularly stark. Closing South Carolina's primaries will not just inconvenience the organizations and their members, it would disenfranchise veterans (including Putative Intervenors' members) who identify as independent voters. As set forth above, the primary election in many South Carolina legislative and congressional districts is not just a preliminary step, it is the election of consequence. *See supra* Background Section I.B. When combined with partisan gerrymandering in South Carolina, closing primaries will effectively exclude independent veteran voters from having a meaningful say in who governs

12

them. Indeed, in just this election cycle, independent voters would have been excluded from voting in 56 contested races that conclusively decided the general election winner. *See id*. Disposition of this case in favor of the Party therefore threatens to undermine Putative Intervenors' organizational goals and dictate whether independent voters can meaningfully participate in the electoral process without declaring themselves to be something they are not: a member of a political party.

Putative Intervenors ask this Court to allow them to intervene under Rule 24(a) to protect the organizations and their members from these significant threats.

### D. Defendants' interests differ from those of the Putative Intervenors.

Defendants' interests differ from the Putative Intervenors' sufficiently to warrant intervention as a matter of right. An intervenor's burden to show inadequate representation of its interests in the litigation "should be treated as minimal." *Teague*, 931 F.2d at 262 (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). Although "'a presumption arises that the movant's interest is adequately represented' when it is seeking to intervene on the side of a party pursuing the same result, the movant need not establish 'the representation by existing parties will definitely be inadequate in this regard.'" *Waffle House, Inc. v. Nat'l Labor Relations Bd.*, No. CV 3:24-6751-MGL, 2025 WL 602744, at *2 (D.S.C. Feb. 10, 2025) (quoting *JLS, Inc. v. Pub. Serv. Comm'n of W. Va.*, 321 F. App'x 286, 289 (4th Cir. 2009)). Rather, where the movant's "'interest is similar to, but not identical with, that of one of the parties,' that normally is not enough to trigger a presumption of adequate representation." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 197 (2022) (quoting Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1909 (3d ed.)). The requirement "is satisfied if the applicant shows that representation of his interest 'may be' inadequate." *Trbovich*, 404 U.S. at 538 n.10. Putative Intervenors more than meet this minimal burden.

A governmental agency such as the State Election Commission is obligated to represent the interests of "all of the citizens of the state." *In re Sierra Club*, 945 F.2d 776, 780 (4th Cir. 1991). Defendants' position is therefore "defined by the public interest, not simply the interests of

13

a particular group of citizens." *JLS, Inc.*, 321 F. App'x at 290–91 (quoting *Feller*, 802 F.2d at 730) (citation modified). In contrast, Putative Intervenors "seek to give voice to a different perspective": that of veterans committed to ensuring access to the ballot for independent-minded voters. *Berger*, 597 U.S. at 198. Because Defendants must serve both those with party affiliation and those without, their interests are not identical to those of independent voters alone. In such a case, "when a party to an existing suit is obligated to serve two distinct interests, which, although related, are not identical, another with one of those interests should be entitled to intervene." *United Guar. Residential Ins. Co. of Iowa v. Phila. Sav. Fund Soc.*, 819 F.2d 473, 475 (4th Cir. 1987) (citing *Trbovich*, 404 U.S. at 538–39); *but see Hunt v. Texas*, Case No. 2:25-cv-200-Z (N.D. Tex. Jul. 17, 2026) (denying VAV's motion to intervene based on "speculation about a future shift in litigation strategy.").

This divergence of interests is not always readily apparent at the outset of litigation but may emerge during the settlement phase. The Fourth Circuit has found intervention appropriate "even when a governmental agency's interests appear aligned with those of a particular private group at a particular moment in time," because the government's duties to the voting public may create such a conflict that the governmental defendant "could settle th[e] case in a manner that could harm Movants' interests." *JLS, Inc.*, 321 F. App'x at 290–91; *see also Jud. Watch, Inc.*, 2024 WL 3454706, at *5 (allowing intervention where "potential intervenors can cite potential conflicts of interests in future settlement negotiations to establish that their interests are not identical with those of a named party").

Additionally, courts have recognized an inherent risk that external political considerations could bring the interests represented by government officials in conflict with the unique interests of a smaller subset of voters in such a way that makes intervention appropriate. *See Berger*, 597 U.S. at 198. For example, in *Berger*, the Supreme Court reversed the denial of a group of legislative leaders' motion to intervene as party-defendants in a challenge to state voter-ID laws. *Id*. It held that the intervenors' interests were not adequately represented by the North Carolina Board of Elections, which was "represented by an attorney general who, though no doubt a vigorous

14

advocate for his clients' interests, is also an elected official who may feel allegiance to the voting public." *Id*. The Court emphasized that the attorney general had previously opposed an earlier voter-ID law and expressed support for a legal challenge against it. *See id*. at 186.

More recently, a case is unfolding in the Northern District of Texas that may foreshadow the Party's next steps. *See Hunt v. Texas*, No. 2:25-cv-200 (N.D. Tex. filed Sept. 4, 2025). In *Hunt*, the Republican Party of Texas followed the Party's same path from proposed legislation to amended party rules to suing to close its primaries. Only a month after filing their complaint, the *Hunt* plaintiffs and the Defendant State of Texas filed a joint Motion for Entry of Consent Judgment, asking the court to enter a final judgment declaring that Texas's open primary system and certain sections of its election code are unconstitutional. *See* Joint Mot. for Entry of Consent Judgment, *Hunt*, No. 2:25-cv-200, ECF 27 (N.D. Tex. Oct. 4, 2025). The Texas Attorney General, representing the State, made no attempt to defend that State's law, and instead sided with his political party to further its ongoing effort to overturn Texas's primary system. *See id*.

As in *Berger* and *Hunt*, Attorney General Alan Wilson has expressed his support for the Party's position both in the legislature and at a press conference promoting this litigation.[6] *See supra* Background Section II.B. Justifiably, Putative Intervenors are concerned about a similar attempt by the Party and Defendants to settle this case by consent in favor of the Party. If this Court refuses to grant intervention, such a settlement would effectively decimate Putative Intervenors' interests without any opportunity to mount a defense.

Therefore, Putative Intervenors ask this Court to grant its Motion to Intervene as a matter of right under Rule 24(a) so that they may protect their significant interests in this litigation, which are not being adequately represented otherwise.

---

[6] Additionally, Attorney General Wilson is currently the leading candidate in South Carolina's 2026 Governor's race. If he wins, he will be responsible for the appointment and removal of members of the Election Commission. *See* S.C. Code §§ 7-3-10, 1-3-240(C)(1)(d); *see, e.g.*, Alexander Thompson & Jessica Holdman, *AG Alan Wilson Declared SC's GOP Nominee for Governor*, S.C. Daily Gazette (Updated June 24, 2026), https://scdailygazette.com/2026/06/23/ag-wilson-declared-gop-nominee-for-governor/.

**II. In the alternative, this Court should grant permissive intervention.**

If the Court declines to grant intervention as of right, it should grant permissive intervention under Rule 24(b), Fed. R. Civ. P. A district court "has broad discretion in granting permissive intervention" and Rule 24(b) is "construed liberally in favor of intervention." *Backus v. South Carolina*, No. 3:11-CV-03120, 2012 WL 406860, at *2 (D.S.C. Feb. 8, 2012). This Court typically considers three factors when determining whether to grant permissive intervention: "(1) the motion to intervene must be timely, (2) an applicant's claim or defense and the main action have a question of law or fact in common, and (3) in its discretion, the court shall determine that the intervention will not unduly delay or prejudice the adjudication of the rights of the original parties." *Id*. (citing *TPI Corp. v. Merch. Mart of S.C., Inc.*, 61 F.R.D. 684, 688 (D.S.C. 1974)).

1.  This Motion is timely, coming shortly after the case began and prior to any discovery or motion practice. *See Bingham v. Wilson*, No. 2:25-CV-163, 2025 WL 608194, at *1, 3 (D.S.C. Feb. 25, 2025) (finding motion to be timely and without prejudice or delay when filed less than a month after the Amended Complaint and before defendant filed its response). Because the Putative Intervenors seek to join the case at the beginning, their involvement runs no risk of delaying proceedings in a way that would prejudice the existing parties. *See id.*

2.  Putative Intervenors' interests go directly to the issues already presented in this lawsuit. The Party's claims will be analyzed under the *Anderson-Burdick* balancing test. *See Colo. Republican Party v. Griswold*, 715 F. Supp. 3d 1339, 1351–52 (D. Colo. 2024) (applying *Anderson-Burdick* test to identical challenge); *accord SCGOP I*, 824 F. Supp. 2d. at 662. Under that test, the Court must consider the burden on the Party in relation to the corresponding burden on, *inter alia*, electoral participation. *Colo. Republican Party*, 715 F. Supp. 3d at 1357 (agreeing that "voter participation in primary elections is an important State interest" (citing *SCGOP I*, 824 F. Supp. 2d at 671)). But rather than asserting a generalized interest in voter participation, Putative Intervenors seek to defend their *specific* fundamental right to participate in South Carolina's state-run primary elections. *See supra* Argument Section I.B. Thus, there is "undeniably" a "common question of law" that warrants permissive intervention. *Bingham*, 2025 WL 608194, at *3; *see also*

16

*Middleton v. Andino*, 481 F. Supp. 3d 563, 571 (D.S.C. 2020) (finding common questions of law or fact where the "[p]laintiffs seek declaratory and injunctive relief that the [c]hallenged [p]rovisions are unconstitutional, while the [p]roposed [i]ntervenors seek to prove the constitutionality of the [c]hallenged [p]rovisions").

Moreover, permitting Putative Intervenors to assert their related but unique arguments will sharpen the issues and the quality of the record, aiding the Court in resolving the issues before it. The Putative Intervenors "do not propose to add new issues to the litigation"; instead, they are trying to assist in resolving the existing ones by offering their unique perspectives as advocacy organizations representing independent, veteran voters. *City of Greensboro v. Guilford Cnty. Bd. of Elections*, No. 15-cv-559, 2015 WL 12752936, at *1 (M.D.N.C. Oct. 30, 2015). Because of this unique perspective, district courts (including this Court) routinely grant permissive intervention to advocacy organizations, even when a government party defends a challenged action. *See, e.g.*, *Thomas*, 335 F.R.D. at 371 (granting permissive intervention to Republican Party of South Carolina in challenge related to election laws); *Tirrell v. Edelblut*, No. 24-CV-251, 2025 WL 1939965, at *4 (D.N.H. July 15, 2025) (allowing "a membership-based organization that represents cisgender athletes" to intervene as a defendant in a suit challenging state restrictions on transgender athletes). This Court should do the same here.

3.      Finally, intervention "will not unduly delay or prejudice the adjudication of the rights of the original parties." *Backus*, 2012 WL 406860, at *2. The timeliness of the Motion ensures that Putative Intervenors are no source of delay. The interests asserted—wholesale disenfranchisement—is neither speculative nor especially fact dependent. Thus, their participation will not meaningfully widen the breadth of discovery or otherwise burden the named parties. *See Middleton*, 481 F. Supp. 3d at 568, 571 (granting permissive intervention where "briefing by the [p]roposed [i]ntervenors would not amount to prejudicial delay, even if it creates some additional work for [p]laintiffs (and the court)").

17

## CONCLUSION

Putative Intervenors VAV and TCN satisfy each factor for mandatory and permissive intervention. Thus, the Motion should be granted "in line with the Fourth Circuit's policy of favoring liberal intervention." *Students for Fair Admissions Inc. v. Univ. of N.C.*, 319 F.R.D. 490, 497 (M.D.N.C. 2017).

Dated: August 3, 2026

Respectfully submitted,

*/s/ Allen Chaney*
  Allen Chaney (Fed. Bar. No. 13181)
  Sarah Schreiber (Fed. Bar. No. 12564)
  ACLU OF SOUTH CAROLINA
  P.O. Box 1668
  Columbia, SC 29202
  (864) 372-6681
  achaney@aclusc.org
  sschreiber@aclusc.org

  Adriel I. Cepeda Derieux*
  AMERICAN CIVIL LIBERTIES UNION FOUNDA-
  TION
  915 15th Street, NW
  Washington, DC 20005
  (202) 457-0800
  acepedaderieux@aclu.org

  Sophia Lin Lakin*
  AMERICAN CIVIL LIBERTIES UNION FOUNDA-
  TION
  125 Broad St., 18th Floor
  New York, NY 10004
  (212) 549-2500
  slakin@aclu.org

*Attorneys for Putative Intervenors*

* Motion for admission *pro hac vice* forth-
coming.

18